# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Carrie A.R. Reeves, | : | Case No.  1:07-CV-1860 |
| Plaintiff, | : | |
| | : | JUDGE KATHLEEN O'MALLEY |
| v. | : | |
| Case Western Reserve University, | : | **MEMORANDUM AND ORDER** |
| Defendant. | : | |

Before the Court is a Motion for Partial Summary Judgment filed by Plaintiff Carrie A.R. Reeves ("Reeves").  (Doc. 26.)  For the following reasons, that motion is **DENIED**.  Also pending before the Court is a substantively related motion asking the Court to ignore a declaration of Defendant Case Western Reserve University ("Case") that Reeves asserts is inconsistent with previous deposition testimony.  (Doc. 59.)  That motion is also **DENIED**, although the Court concludes that the deposition in question contained testimony offered in bad-faith and will allow Reeves to reopen that deposition at Case's expense if she wishes.  Finally, pending before the Court is Defendant Case Western Reserve University's ("Case") Motion for Summary Judgment (Doc. 25), on which briefing was previously stayed pending final resolution of a discovery dispute and a request for sanctions in connection therewith.  The Court now **TERMS** Case's motion for summary judgment (Doc. 25), **HOLDS** that Case may not refile a portion of this motion, **ORDERS** Case to submit a new motion complying with this order within **TWENTY-ONE DAYS**, and **ORDERS** Case to comply with the discovery order that is outlined below.

## I.  BACKGROUND

Broadly speaking, this case is an action for wrongful termination brought by an employee who contends that she was discriminated against because she suffers from depression and a seizure disorder. While that broad claim is clear, however, many of the underlying facts are not.  While the parties in this action obviously have spent many hours on this litigation, the Court fears that both sides have lost sight of the larger picture.  The parties, for example, extensively brief a claim that appears only tangentially at issue, while neglecting to brief a seemingly more pertinent claim under the same statute.  Far more problematically, the parties' characterizations of the basic facts of this case are so widely divergent that the Court has had difficulty discerning what each party believes is relevant and why: the Court still, for example, does not know when Reeves initially chose to reveal her depression to Case, which is, as explained below, a highly material fact.[1]  The Court, nonetheless, sets forth the facts of this action to the extent they can be ascertained from the current evidence before it, viewed in the light most favorable to Case.

---

[1] In the future, the Court **will not consider any argument unsupported by a proper citation**. Both parties have frequently asserted that the evidence shows a particular fact (sometimes employing quotation marks) without providing a citation to the Court such that the Court can determine which document contains the relevant language.  Although the Court has, whenever possible, deciphered the parties' references, the Court obviously cannot consider those arguments for which it was unable to determine the underlying evidentiary basis.

Along the same lines, the parties do themselves a disservice by filing thousands of pages of documents and essentially trusting the Court to decipher how small portions of these documents may or may not relate to the parties' arguments.  Both parties, moving forward, would be well-served to ensure that the portions of documents on which they would like the Court to rely are clearly delineated and attached to the relevant briefing.

The Court respects the many hours that these parties have devoted to this litigation, but that is assuredly all the more reason for them to be careful in the manner that they present evidence to the Court for review.

2

### A.  Reeves' Positions at Case

On September 6, 1977, Reeves began her employment at Case as the Assistant to the Director of Upward Bound.  (Doc. 24 ¶ 4; Doc. 26-2 ¶ 2; Doc 26-9 at 1.)  Slightly less than two years later, on August 23, 1979, Reeves was promoted to director.  (Doc. 24 ¶ 5.)  She remained in that position until 1998, when Case combined Upward Bound with a new program, the Talent Search Program, collectively referred to by Case as "Access/Trio."  (*Id.* ¶¶ 6-8; Doc. 26-2 ¶ 3.)[2]  In November of 1998, Reeves was made the director of this new combined program, which is a part of the Case Department of Student Affairs.  (*Id.*)

### B.  Reeves' Medical Disabilities

Reeves asserts two disabilities, seizure disorder and major depressive disorder.  (Doc. 26-1 at 3; Doc. 26-2 at ¶¶ 6-12.)  Reeves has undergone treatment for the seizure disorder since 1993.  (Doc. 26-2 at ¶ 5.)  While Reeves points primarily to her own testimony regarding this disorder (Doc. 26-1 at nn.6-12; Doc. 26-7 at 2-5), Case does not challenge its legitimacy, nor that it constitutes a disability under the applicable law (Doc. 54 at 16).[3]

In 2002, Reeves was diagnosed with major depressive disorder ("MDD") by her primary care physician.  (Doc. 26-3 at ¶ 3.)  On September 11, 2003, two doctors at the Cleveland Clinic reached the same diagnosis.  (Doc. 26-3 ¶¶ 2-3.)[4]  Reeves presents unrebutted testimony that her MDD is so severe

---

[2] Access/Trio, as described by Case, is a program that attempts to provide access to post-secondary education to low income and potential first generation college students.  (*Id.* ¶ 10.)  It provides academic assistance, advising, instruction, tutoring, college planning and placement assistance, cultural activities, internships, community service opportunities, and career exposure in the summer and during the school year.  (*Id.* at ¶ 11.)

[3] Reeves testifies that these episodes are quite severe, resulting, for example, in memory loss.  (Doc. 26-2 at ¶ 12.)

[4] The attached document reflects that two doctors participated in a single diagnosis.  The Court, unfortunately, does not know what this diagnosis says.  While Reeves provided a copy of the original diagnosis (*see* Doc. 26-3), she did not provide a typed copy of that diagnosis and the Court is unable to decipher much of the handwriting in this document, particularly on the first and sixth pages.

that, during "episodes" it can confine her to bed for hours during the day (Doc. 26-2 ¶ 19), severely limit her ability to sleep (*id*.), prevent interaction with others at beyond a minimal level (*id*. at ¶ 20), and that, when undergoing an episode of MDD, she does not cook, clean, or spend time with her husband and family (*id*. at ¶ 22).  She states that the last time she had an MDD episode, her psychiatrists told her to refrain from work.  (*Id*. at ¶¶ 24-25.)  She presents, in sum, unrebutted testimony that her MDD substantially interferes with major life activities.  (*Id*. at ¶¶ 13-23; *see also* Doc. 26-3 at ¶¶ 3-4.)

### C.  Reeves' Communications with Case Regarding Her Disabilities

As discussed below, Case instructs employees who request an accommodation under the various disabilities laws to submit an open-ended form describing their requested accommodation.  (Doc. 53 at 29-30.)  In 1998, Reeves submitted this form to the university, on which she identified herself as having a seizure disorder, for which she did not request any accommodation.  (*Id*.)  There is no evidence that Reeves ever submitted another such form, although Reeves did provide information to the Case benefits office that the reason for her final leave of absence was depression.  (Doc. 57 at 89:25 – 90:4.)  Of great relevance, however, the Court is aware of no evidence that would allow it to conclude precisely when Reeves communicated this fact to Case – in particular, whether such a communication was made before Reeves had used all of her allotted leave under the FMLA.  (*See, e.g.*, Doc. 26-2 at ¶¶ 27-28.)[5]

### D.  Reeves' Performance

Reeves was not terminated for performance reasons.  (Doc. 26-5 at 4:16; Doc. 26-6 at 29:5-30:3.)  The parties, nevertheless, devote extensive briefing to the issue of Reeves' performance as director of Access/Trio to attempt to establish whether she was qualified for the position that she held.[6]  As explained below, moreover, although this action has been pending for more than two years, it

---

[5] It appears that Reeves may have sent Case notice that she was on leave related to depression in July and August of 2003 (*see* Doc. 26-4 Ex. A), although this is by no means certain (*see generally* Doc. 26-4 (containing no indication when exhibit A was transmitted to Case); *but see* Doc. 26-4 Ex. A (containing a date-stamp indicating that it was sent on July 28, 2003).)

[6] As explained more fully below, this is a relevant inquiry under Reeves' claims.

appears that Case <u>still</u> has not produced all of the relevant evidence relating to this issue.  In light of the confusion surrounding this issue, because information regarding Reeves' performance is not necessary to resolve the instant motion, and because the factual analysis performed by a Court on a motion for summary judgment (viewing the facts in the light most favorable to the non-moving party), is of limited practical use for the parties in this particular action, the Court will not address Reeves' performance at this time.[7]

The Court does, however, make note of one particular sentence related to Reeves' performance. Dennis Rupert, the Director of Finance and Administration for Student Affairs at Case, wrote: "Finally, some other transfers were to be processed by Carrie, but because of the unexpected medical leave, another window of opportunity to transfer some additional costs was also lost."  (Doc. 26-10 at 34.) Reeves asserts that this document, criticizing aspects of her performance "grumble[s] about Reeves' FMLA leave."  (Doc. 26-1 at 21.)  Although this characterization is not unreasonable, viewing the document in the light most favorable to Case, it could also be viewed, as Case contends, as criticism of Reeves's failure to put back-up procedures in place in the event that she was unable to perform some of her duties, rather than criticism of Reeves' leave itself.[8]

---

[7] Broadly speaking, Case contends that at least some of Reeves' leaves of absence were taken shortly after (and, implicitly, because) she began to receive complaints about her performance, while Reeves contends that she began to receive low performance reviews shortly after, and because, she began taking leaves of absence.  It is, however, undisputed that Reeves received uniformly positive official performance reviews until September 9, 2003, although Case asserts that there were difficulties with Reeves' performance that were communicated to Reeves outside the formal review process.  This issue appears problematic for Case; although Case asserts serious allegations about Reeves' performance that would make it difficult for a reasonable jury to conclude that Reeves was "qualified" for her position, Reeves can point to a string of positive performance reviews, and to Case's current admission that Reeves is qualified, generally, to work at Case, notwithstanding, for example, Case's apparent belief that she committed fraud.  Reeves also submits evidence regarding the apparent destruction and alteration of evidence that, if true, may justify a negative inference instruction on this issue.  Case's discovery violations are discussed in more depth below.

[8] So, too, on the evidence before the Court, Reeves' attempt to take that sentence and combine it with Patterson's testimony that Reeves was not rehired because of her leadership skills and her budgeting work (Doc. 26-5 at 10:5-22) in order to assert that Reeves' was not rehired because she took

**E.  Reeves' Exceeds 12 Weeks of Leave**

In 2002, Reeves began taking fairly substantial leaves of absence.  (*See* Doc. 24 at ¶¶ 82-85.)  Of particular relevance, on August 22, 2003, Reeves submitted a form to Case that she was under a doctor's care for "right wrist surgery" and would be out of the office from September 16, 2003 through September 28, 2003.  (Doc. 26-9 at 9; *see also* Doc. 53 at ¶¶ 6-7.)  It is not possible to make-out the signature on this form, but the form was sent from the Cleveland Clinic.  (Doc. 26-9 at 9.)  On September 22, 2003, Reeves sent another note from the Cleveland Clinic that she had been "ill and unable to work" beginning on September 16, 2003 and would not be able to return until December 1, 2003.  (*Id.* at 25.)  Viewing the facts in the light most favorable to Case, this note appeared to relate to her right-wrist surgery.  (*Id.*)[9]

By September 30, 2003, Reeves had taken more than 12 weeks of leave over the preceding 12 months.  (*Id.* at ¶ 44.)

On November 11, 2003, after Reeves' FMLA protected leave had expired, one of Reeves' doctors wrote a note to Case asking that it extend Reeves' FMLA leave until January 5, 2004.  (Doc. 26-9.)  This document, however, does not appear to have been transmitted to Case until November 24,

---

FMLA leave (Doc. 26-1 at 19), is not a reasonable view of the facts as seen in the light most favorable to Case.

[9] There is a document that may or may not have been sent to Case along with this note with considerably more information.  (*See* Doc. 26-9 at 26; Doc. 26-10 at 11.)  This document does state that Reeves is depressed and has a serious health condition under FMLA.  The only marking on the document with any date at all, however, asserts that the document was faxed to Case on September 11, 2003, yet Reeves' initial note from her psychiatrist was signed on September 22, 2003.  The Court must assume that the date-stamp on the fax is in error, or that it refers to a fax that was not sent to Case.  The Court, therefore, has no way to determine when this document might have been sent and, viewing the facts in the light most favorable to Case, must assume that it was some time after November 12, 2003.

The Court, further, is perplexed by aspects of the entire September timeline.  It does not know what to make of evidence that two Cleveland Clinic doctors diagnosed Reeves with MDD on September 11, 2009 (*see* Doc. 26-3 ¶¶ 2-3), yet one of those same doctors only provided certification that she would miss work beginning on September 16, 2003 (*see* Doc. 26-9 at 25), the very same date that Reeves stated she was having wrist surgery (Doc. 26-9 at 9).

2003.  (*See id*. (containing a date-stamp from the fax machine).)  This letter did indicate that it was sent by Philip L. Lartey, M.D. from the Department of Psychiatry and Psychology, but contained no details about the nature of Reeves' absence.  (*Id*.; *c.f.* Doc. 26-9 at 5 (containing a two-sentence doctor's note submitted by Reeves in 1979 that <u>did</u> explain the reason for Reeves' absence).)

On November 12, 2003, Case sent a letter informing Reeves that it would be hiring someone else to fill her position, but that Case would assist Reeves in finding another position when she returned from her leave of absence:

> University policy requires that a position be held for a period of 12 weeks when an employee is on a personal medical, family medical, or parenting leave of absence.  Our records indicate that you have been on a personal medical leave of absence from January 21, 2003 to February 5, 2003, June 11, 2003 to August 4, 2003, and are currently on a personal medical leave since September 16, 2003.  Because these personal medical leaves have extended longer than 12 weeks, the University will be hiring someone to fill your position.
>
> Once an employee who is granted a leave for longer than 12 weeks is able to return to work, the University will attempt to restore the employee to the same or comparable position if possible.  As soon as you know when you will be able to return to work, please contact . . . the Human Resources Department.  At that time [an employee in the Human Resources Department] will assist you in your search for another University position.

(Doc. 23 at 16.)

On January 5, 2004, more than six weeks after Reeves had been informed that Case would be hiring someone else to fill her old position and more than eight weeks after her leave under the FMLA expired, Dr. Lartey sent Case another fax.  (Doc. 26-9 at 24.)[10]  The two-sentence letter stated that it was sent "to extend [Reeves' FMLA] absence until February 5, 2004."  (*Id*.)  While the second sentence of the letter invited Case to call the doctor, the letter contained no other information.  (*See id*.)

---

[10] The Court notes that the date-stamp on this fax, January 5, 2004, matches the date on Dr. Lartey's letter.  (*See* Doc. 26-9 at 24.)

**F.  Applicable Case Policies**

Case has three separate policies at issue in this litigation.  (*See* Doc. 23 at ¶¶ 34-45; Doc. 53 at ¶¶14-17.)[11]

### 1.  Case's Personal Medical Leave Policy

Case pays its employees' benefits for up to 26 weeks of leave.  (Doc. 53 at ¶¶ 10-12; Doc. 23 at 9-11.)  In relevant part, this policy provides:

> The annual maximum leave time for personal medical reasons is 26 weeks within a 12 month period, at which time the employee may apply for long term disability benefits.

(Doc. 23 at 10.)  At the conclusion of this 26 week period, however, if an employee has neither applied for and received long-term disability benefits, nor applied for and received additional leave as an accommodation for a documented disability, the employee is automatically considered to have resigned from Case.  (Doc. 53 ¶ 12.)[12]

While Case guarantees benefits for as many as 26 weeks, it will only "hold the employee's position . . . for 12 weeks during … a 12-month period."  (*Id.*; *see also* Doc. 23 at 9-11.)  Consistent with the November 12, 2003 letter sent to Reeves, the policy explains:

> The University will hold the employee's position, or an equivalent position, for 12 weeks during any personal medical, family medical, or parenting leave during a 12-month period.  If the 12 weeks have not been exceeded when the employee returns from leave, the University will return the employee to the same position or an equivalent position. . . . However, if a leave exceeds 12 weeks and if the supervisor has proceeded with a replacement, the Human Resources Department will attempt to assist in placing the employee in a comparable position.  However, Human Resources cannot guarantee that the employee will be placed in any position at CWRU after 12 weeks.

---

[11] The Court does not understand why Case's briefing asserted that these were "four" policies.  (*See* Doc 54 at 18-22.)  This was confusing and an inaccurate description of the cited documentary evidence and relevant supporting declarations – the Court exhausted needless resources puzzling through the difference between Case's briefing and the evidence.  Notably, this briefing presents a picture that, in some ways, is a less helpful characterization for Case than the truth.

[12] Reeves argues that this is a per se rule that leaves cannot extend beyond 26-weeks.  (Doc. 26-1 at 10; Doc. 58 at 24-25.)  Viewing the facts in the light most favorable to Case, however, there is no per se rule from which Reeves could not have requested an exception as an accommodation.  (*See* Doc. 53 at 9-13; Doc. 26-6 at 9-10; *but see* Doc. 58-1 at 61.)

(*Id*.)  According to university policy, then, an employee can collect benefits for 26 weeks, but is only guaranteed employment for 12.

## 2. Case's Income Protection Policy

Case's income protection policy determines whether an employee is paid during any given week in which that employee is on leave of absence, but does not itself determine how much leave that employee is entitled to take.  (Doc. 23 at 13-14.)  In relevant part, this policy provides:

> An employee may draw from their income protection balance up to a *maximum* of 26 weeks within any twelve month time period for personal medical leaves, Employees may draw on this time over the year but may not carry the time forward to the next year nor include it in termination pay calculations.

(Doc. 23 at 13) (emphasis added).  This determination is made based on the length of an employee's tenure – if an employee has been at Case for more than 10-years, for example, that employee is entitled to six months of income.  (*See id*.)  Unlike Case's Personal Medical Leave policy, however, the determination of how much "income-protected" time remains is based on the calendar year.  (*See id*. at 13.)  For this reason, it is possible for an employee to have substantially more "income-protected" time than an employee actually has leave available.[13]  An employee, however, can only collect a salary from Case based on her "income-protected" time if she is on an otherwise approved leave.  (*See id*.)

## 3. Americans with Disabilities Act Accommodations

Case also has a policy addressing the Americans with Disabilities Act ("ADA").  (Doc. 53 at 9-13.)  This policy allows an employee to request accommodation under the ADA.  (*Id*. at 10.)  An employee who would like to do so may complete an "Employee Disability Self Identification" form

---

[13] "Income-protected" time available automatically resets on January 1 of the calendar year, while "Personal Medical" time is based on the amount of leave of which an employee has availed herself over the preceding 12-months.

9

identifying the nature of the disability as well as any requested accommodation.  (*Id.* at 26-27.)[14]  This form is open-ended and allows an employee to request what she believes to be an appropriate accommodation.  (*See id.*)[15]

### G.  Reeves is Denied a Position Upon Return

On January 30, 2004, Reeves submitted a form from her physician explaining that she would be certified to return to work on February 5, 2004.  (Doc. 26-9 at 7.)  As previously explained, this form contained no other information.  (*Id.*)  On February 3, 2004, Case sent Reeves a letter, copied to Reeves over e-mail:

> On January 29, 2004, the university received documentation from your healthcare provider stating that you are able to return to work on February 5, 2004.  On November 12, 2003, I sent you a letter which stated that because you were on personal medical leaves that extended longer than 12 weeks, the university would be hiring someone to fill your position.  In addition, university policy states that the annual maximum leave time for personal medical reasons is 26 weeks within a 12 month period. To date, university records indicate that your personal medical leaves have exceeded 26 weeks within a 12 month period.  Therefore, based on the length of your personal medical leaves, you will not be able to return to the position of Director of Access/Trio Programs on February 5, 2004.
>
> Please be advised that the search for the Director of Access/Trio Programs has begun.  If you are interested in applying for this position or any other position at the university for which you are qualified, contact [a particular] Employment Specialist, at [that person's phone number]. . . . If you have any questions, feel free to contact me. . . .

(Doc. 23 ¶ 49; *id.*, Ex D at 19.)[16]

---

[14] Reeves argues that the use of this form is not mandatory, as Case supplies a declaration saying only that employees are "encouraged" to use the form (*see* Doc. 58 at 18 (citing Doc. 53 at ¶ 16)) and the policy and procedures manual never states that employees are "required" to use it (*see* Doc. 58-3 at 4).  This is a plausible argument – perhaps, on the current evidence, even a strong one – but it is not the only reasonable view: these can be read to encourage disabled employees to request accommodations, not that there are alternative vehicles available to do so.  It is this second reading that the Court must adopt here.

[15] As discussed above, Reeves completed one such form in 1998, identifying herself as having a seizure disorder for which she did not request any accommodation.  (*Id.* at 29-30.)

[16] Reeves assertion that "Defendant terminated Reeves the very day she was scheduled to return to work" (Doc 26-1 at 10) is contradicted by the evidence (Doc 23 ¶ 49).

While Case informed Reeves that she could reapply for her old position (*id*.), and although Reeves applied for that position (Doc. 26-6 at 70:22-24), Case ultimately hired a different candidate on July 28, 2004 (Doc. 26-9 at 28).[17]  This lawsuit then ensued.

## II.  APPLICABLE LAW

### A.  The Standard for Summary Judgment

Reeves has moved for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  (Doc. 26.)  Under Rule 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

 In reviewing summary judgment motions, this Court must view evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases, the Court will decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Anderson*, 398 U.S. at 252.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the non-moving party's claim.  *Moldowan v. City of Warren*, 570 F.3d 698, 719 (6th Cir. 2009); *Street v. J.C.*

---

[17] Reeves devotes a meaningful portion of her briefing to argument regarding what transpired during the search process for her old position.  (Doc. 26-1 at 11-12.)  Although her assertions, if true, would show unprofessional behavior on the part of Case and although this might be part of the *McDonnell-Douglas* analysis and qualify as "direct" evidence of discrimination (discussed below), the Court is not clear how these arguments connect to her motion for partial summary judgment.

*Bradford & Co.*, 886 F.2d 1472, 1479-80 & n.12 (6th Cir. 1989).  The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Curto v. Harper Woods*, 954 F.2d 1237, 1241 (6th Cir. 1992) (quoting *Ceolotex*, 477 U.S. at 322); *Ocean Innovations, Inc. v. Quarterberth, Inc.*, No. 1:03-CV-0913, 2009 U.S. Dist. LEXIS 54108, at *8-9 (N.D. Ohio June 26, 2009) (citing *Ceolotex*, 477 U.S. at 322).

 In response, if the moving party establishes the absence of a genuine issue of material fact, to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"; rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact."  *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted).  Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Barr v. Lafon*, 538 F.3d 554, 574 (6th Cir. 2008).

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a

preponderance of the evidence that the [non-moving party] is entitled to a verdict – whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.") (emphasis in original) (internal quotations omitted).

### B. Reeves' Claims Under O.R.C. 4112(A)

Reeves first moves for summary judgment on count three of her complaint, which she characterizes as containing a single claim under Ohio Revised Code § 4112(A).[18] Section 4112.02(A) of the Ohio Revised Code prohibits employers from "discharging without just cause, . . . refusing to hire, or . . . otherwise discriminating against [a] person with respect to hire, tenure, terms, conditions, or privileges of employment . . . because of [a] handicap."  In evaluating such a claim, the Court may look to the Americans with Disability Act ("ADA") for guidance because the Ohio Supreme Court has held that the statutes are substantially similar.  *See Wysong v. Dow Chem. Co.*, 503 F.3d 441, 450 (6th Cir. 2007) ("Because '[t]he federal [ADA] is similar to the Ohio handicap discrimination law[,] . . . [w]e can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law.'") (quoting *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204 (Ohio 1998)); *see also Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 n. 2 (6th Cir. 2000) ("[B]oth federal and Ohio discrimination actions require the same analysis.").

There are multiple possible claims under O.R.C. § 4112(A), however, and it is here that things become somewhat confusing.  In count three of her amended complaint, Reeves alleges:

---

[18] Reeves does not exactly state that she is moving for summary judgment on this count of her complaint.  Rather, she says that she is moving for summary judgment with "with respect to her R.C. 4112 disability claim," which the Court presumes refers to this count of her complaint, although other counts of her complaint allege violations of the same statute.  Reeves, moreover, begins her motion with citation to an entirely different statute, the Americans with Disabilities Act ("ADA"), presumably because the two statutes are generally interpreted in the same way.  *See Gembus v. MetroHealth Sys.*, 290 Fed. Appx. 842, 847 (6th Cir. 2008) ("Ohio's disability discrimination statute is analyzed similarly to the Americans with Disabilities Act." (citing *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007))).

> Case Western unlawfully discriminated against Mrs. Reeves because of her disability with respect to the pay, terms, conditions, and privileges of her employment by taking action against her with respect to pay, the terms, conditions, and privileges of her employment, including but not limited to unfairly and discriminatorily scrutinizing and evaluating her work, sabotaging her work, interfering with her supervisory relationships, investigating her, denying her extended leave benefits, removing her from her position, falsely claiming that she had resigned her employment and/or withdrawn her application for open positions for which she was qualified, refusing to transfer, redeploy, recall, or rehire her to her former position or to other open positions for which she was qualified, refusing to provide her with termination review and grievance benefits, and terminating her employment.

(Doc. 12 ¶ 48.)  This is a claim for what the court will term "direct" discrimination.  As the Sixth Circuit has explained:

> Under Ohio law, to make a prima facie case of disability discrimination, a plaintiff must show "(1) that he or she was handicapped, (2) that an adverse employment action was taken by an employer, at least in part, because the individual was handicapped, and (3) that the person, though handicapped, can safely and substantially perform the essential functions of the job in question."

*Talley v. Family Dollar Stores of Ohio, Inc.*, No. 07-3971, 2008 U.S. App. LEXIS 19342, at *9-10 (6th Cir. 2008) (designated for publication) (quoting *Hood v. Diamond Prods, Inc.*, 658 N.E.2d 738, 739 (Ohio 1996)); *see also Clark v. Whirlpool Corp.*, 109 Fed. Appx. 750, 753 (6th Cir. 2004) (quoting *Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206 (Ohio 1998)); *White v. Coyne Int'l Enters. Corp.*, No. 3:02-CV-7505, 2003 U.S. Dist. LEXIS 15347, at *5-6 (N.D. Ohio July 23, 2003). Reeves could attempt to prevail on such a claim either through "direct evidence" or through "the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Merrill v. Burke E. Porter Mach. Co.*, 159 Fed. Appx. 676, 678 (6th Cir. 2005).  It is the latter framework that would likely be applicable here and, under that framework, once she made out a prima facie case of discrimination, the burden would shift to Case to articulate legitimate non-discriminatory reasons for her termination.  *Seitz v. Lane Furniture Indus.*, No. 07-171, 2008 U.S. Dist. LEXIS 79651, at *29 (N.D. Ohio Sept. 17, 2008).  Presuming Case could do so, the ultimate burden would then shift back to Reeves to show that those non-discriminatory reasons were merely pretextual.  *Id.*

Reeves' motion for summary judgment, however, contains no such claim.  Reeves, instead, asserts that Case failed to make reasonable accommodation for her disability, a somewhat different type of claim, albeit also one under O.R.C. 4112(A).  *Compare* O.A.C. § 4112-5-08(A) ("Discrimination prohibited.") *with* O.A.C. § 4112-5-08(E) ("Reasonable accommodation."); *see also Shaver v. Wolske & Blue*, 742 N.E.2d 164, 171 (Ohio Ct. App. 2000) ("[D]isability discrimination . . . can include both an employer's taking an adverse employment action based on an employee's disability and an employer's failure to make a reasonable accommodation." (emphasis added); *cf. White*, 2003 U.S. Dist. LEXIS 15347 at *5 ("Plaintiff claims defendant terminated him because of his disability and that defendant unlawfully refused to accommodate his disability.  Both of plaintiff's claims fail as a matter of law." (emphasis added)); *id*. at *5-6, *16-17 (setting forth the elements of a disability discrimination claim and failure to accommodate claim, respectively); *Swanson v. Senior Res. Connection*, 254 F. Supp. 2d 945, 958 (S.D. Ohio 2003) ("[Plaintiff's] Second Claim for Relief arises under the discrimination law of Ohio, Ohio Rev. Code § 4112.01, *et seq*, and actually alleges two different theories of discrimination: discrimination because of a disability and discrimination in the form of [Defendant's] alleged failure to accommodate the disability.").

To prevail on a claim that Case refused to accommodate her disability, Reeves must show:

(1) she is disabled within the meaning of the [ADA]; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) [Case] knew or had reason to know about her disability; (4) she requested an accommodation; and (5) [Case] failed to provide the necessary accommodation.

*Myers v. Cuyahoga County*, 182 Fed. Appx. 510, 515 (6th Cir. 2006) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)); *see also Shaver*, 742 N.E.2d at 171.  Although Case has the burden to show that any requested accommodation was not reasonable after Reeves establishes her prima facie case, *Myers*, 182 Fed. Appx. at 515 (citing *DiCarlo*, 358 F.3d at 419), burden shifting otherwise does not apply to a failure to accommodate claim. *White*, 2003 U.S. Dist. LEXIS 15347 at *16-17 (citing *Shaver*, 742 N.E.2d at 171); *see also Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999) ("[A]

15

reasonable accommodation claim is not subject to the familiar three-part analysis of *McDonnell-Douglas*."); *Bultemeyer v. Fort Wayne Community Sch.*, 100 F.3d 1281, 1283 (7th Cir. 1996) ("If it is true that [Defendant] should have reasonably accommodated [Plaintiff's] disability and did not, [Defendant] has discriminated against him.  There is no need for indirect proof or burden shifting.").

The Court has experienced some difficulty in attempting to determine which framework applies to this case.  Reeves' complaint plainly states a claim for direct discrimination, and the majority of the facts in this case seem to fit such a claim more naturally.  In briefing, however, both parties seem to agree that this motion concerns a "failure to accommodate" claim.  It seems, properly understood, that there are really two different claims: (1) that Case failed to accommodate Reeves by declining to give her additional leave and; (2) that Case directly discriminated against Reeves when it fired and refused to rehire her.[19]  It almost goes without saying, of course, that Reeves cannot meet her burden on this latter claim, which she did not attempt to argue.[20]  The Court will, consequently, consider only the first of these claims at this time.

### C.  The Elements of Reeves' FMLA Claims

The purpose of the FMLA is to prevent an employee from losing her job because she has to take time off work in the event that the employee or an immediate family member is afflicted with a serious health condition.  29 U.S.C. § 2601.  Under the FMLA, an eligible employee is entitled to take up to twelve weeks of unpaid leave during any twelve month period to attend to a serious health condition. 29 U.S.C. §§ 2601 and 2612(a)(1)(D).[21]  In counts one and two of her complaint, Reeves alleges that Case

---

[19] On the facts of this particular case, it is unclear that this distinction will be outcome determinative, but it is a distinction that, nevertheless, must be made given the different legal analysis applicable to each claim.

[20] Reeves, for example, has not shown that no reasonable juror could conclude that Case's reasons for firing and refusing to rehire Reeves were not pretextual.

[21] Section 2612(a)(1)(D) provides:

violated the FMLA by (1) failing to reinstate her to a substantially similar position after she returned from leave; (2) giving her a negative performance evaluation at least in part because she exercised her right to FMLA leave; and (3) "discriminated and retaliated" against her for asserting her rights under the FMLA.  The parties, and Sixth Circuit law, recognize these allegations as distinct claims – the first two are "entitlement/interference" claims arising under 29 U.S.C. § 2615(a)(1) and the third is a "retaliation/discrimination" claim arising under 29 U.S.C. § 2615(a)(2).  *See Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 243 (6th Cir. 2004).

### 1.  Entitlement/Interference under 29 U.S.C. § 2615(a)(1)

Reeves first claims that she was given a negative review because she took FMLA protected leave.[22]  This is known as an "entitlement/interference" claim.  As set forth in the FMLA:

> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

29 U.S.C. § 2615(a)(1).[23]

---

(1) Entitlement to leave.  Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

. . .

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1)(D).

[22] Reeves' amended complaint actually alleges many other grounds for her "entitlement/interference" claim (*see* Doc. 12 at ¶ 25), but the motion for summary judgment appears to concern only these.

[23] An employee who exercises her right to FMLA leave is entitled to reinstatement, as described in § 2614(a).  *See also Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 486 (6th Cir. 2005). Section 2614(a) describes both the entitlement to reinstatement, and the limitations on that right:

(1) In general.  Except as provided in subsection (b) of this section, any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave –

(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

Reeves must satisfy five elements to prevail on her FMLA entitlement claim. She must establish that: (1) she was an eligible employee; (2) Case is an employer for purposes of the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave Case notice of her intent to take leave; and (5) Case interfered with FMLA rights to which she was entitled.  *Grace v. USCAR*, 521 F.3d 655, 669 (6th Cir. 2008); *Hoge*, 384 F.3d at 243.  The first four elements are undisputed: Reeves was (1) an eligible employee of a (2) covered employer (3) who was entitled to take FMLA leave and (4) who gave Case notice of her intent to take leave.  (Doc. 54 at 42 ("[T] the parties agree that Reeves is able to satisfy the first four elements of an interference claim.")).  Intent is not a requirement to establish a violation under the FMLA: "[b]ecause the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." *Id*. (citing *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)).  The issue is whether Case interfered with Reeves' rights under the FMLA.

It is clear that "interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Grace*, 521 F.3d at 670 (quoting *Edgar v. JAC Prods.*, 443 F.3d 501, 507 (6th Cir. 2006)).  It is also clear, moreover, that "negative evaluations, without more, do not constitute adverse

---

(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

(2) Loss of benefits.  The taking of leave under section 2612 of this title shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced.

(3) Limitations.   Nothing in this section shall be construed to entitle any restored employee to –

(A) the accrual of any seniority or employment benefits during any period of leave; or

(B) any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.

29 U.S.C. § 2614(a).

employment actions." *Bacon v. Honda of Am. Mfg., Inc.*, 192 Fed. Appx. 337, 343 (6th Cir. 2006) (citing *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999)).

### 2. Retaliation/Discrimination under 29 U.S.C. § 2615(a)(2)

Reeves' second claim is that she was not rehired because she took FMLA leave.  This is generally known as a "retaliation" or "discrimination" claim.  *See* 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.").[24]  It is analyzed under a similar *McDonnell Douglas* burden-shifting approach to her disability discrimination claim.  *Edgar v. JAC Prods.*, 443 F.3d 501, 508 (6th Cir. 2006); *see also Hunter v. Valley View Local Sch.*, No. 08-4109, 2009 U.S. App. LEXIS 19141, at *10-11 (6th Cir. 2009) (designated for publication) ("In light of our reading of the FMLA through the lens provided by *Gross*, we continue to find *Price Waterhouse's* burden-shifting framework applicable to FMLA  retaliation claims.").[25]

---

[24] Section 2614(a)(3)(B) limits an employee's rights, however: "an employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a).  The Sixth Circuit has held:

> [A]n employee who requests FMLA leave [has] no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request.  An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave.  Thus, if the employer claims that the employee would have been discharged . . . the employee, in order to establish the entitlement protected by § 2614(a)(1), must, in the course of establishing the right, convince the trier of fact that the contrary evidence submitted by the employer is insufficient and that the employee would not have been discharged . . . if he had not taken FMLA leave.

*Moorer*, 398 F.3d at 488-89. (citations omitted) (quotation marks omitted).  While *Moorer* refers to termination, "same limitations are applicable to reinstatement under § 2614(a)(1)." *Seitz*, 2008 U.S. Dist. LEXIS 79651, at *72.

[25] The distinction between what is termed "*McDonnell Douglas*" burden shifting and "*Price Waterhouse*" burden shifting is not material for present purposes.  *C.f. Price Waterhouse v. Hopkins*, 490 U.S. 228, 260 (1989) (White, J., concurring) ("I agree with Justice Brennan that applying this approach to causation in Title VII cases is not a departure from, and does not require modification of,

Reeves may satisfy the elements of her prima facie case by showing that: (1) she availed herself of a protected right under the FMLA; (2) she was subjected to an adverse employment action; and (3) there was a causal connection between the exercise of her FMLA rights and the adverse employment action. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir.2001). "If the employee satisfies these three requirements, the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for [the adverse employment action]." *Edgar*, 443 F.3d at 508 (citing *Skrjanc*, 272 F.3d at 315). If the employer proffers a legitimate, non-discriminatory reason, the burden shifts back to the employee to show that the proffered reason is actually a pretext for unlawful discrimination. *See Hunter*, 2009 U.S. App. LEXIS 19141, at *10-11.

To prevail on her motion for summary judgment, Reeves must demonstrate that Case would have rehired her, but for the fact that she took FMLA leave.[26]  Of Course, even if Case proffers legitimate reasons for failing to rehire Reeves, she may demonstrate that those reasons are mere pretext:

---

the Court's holdings in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).").  Indeed, as indicated above, the Sixth Circuit has referred to FMLA burden shifting both as *McDonnell Douglas* and as *Price Waterhouse*.

[26] There is language in the caselaw and regulations worthy of exposition on this point.  This Court has previously noted that an employee need only show that her leave was a "negative factor" in the employer's ultimate decision to terminate that employee.  *Seitz,* 2008 U.S. Dist. LEXIS 79651, at *72 (citing *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 408 (6th Cir. 2003)); *see also* 29 CFR 825.220.  There are two possible interpretations of this language.  First, this could simply clarify that any retaliation against an employee who takes FMLA leave because she took that leave is unacceptable, even when the FMLA leave is merely the metaphorical "straw" on top of many legitimate reasons for termination.  Second, however, it could be interpreted to do away with the requirement of "but-for" causation entirely, and mean that an employee need not show that, "but-for" her taking of FMLA leave, she would not have suffered an adverse employment action.

It is clear that the former interpretation is correct – to conclude otherwise would ignore the plain language of the FMLA, which does not purport to create any rights that an employee would not have had absent her leave.  29 U.S.C. § 2614(a)(3) ("Nothing in this section shall be construed to entitle any restored employee to. . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."); *see also Hunter*, No. 08-4109, 2009 U.S. App. LEXIS 19141, at *10-11 (making clear that this is a "but for" test); *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 804-805 (7th Cir. 2001) ("[The plaintiff] must prove that [the employer] would not have discharged her had she not taken FMLA leave.").

> If the defendant proffers . . . a [legitimate] justification, then the plaintiff may seek to rebut it by a preponderance of the evidence.  Specifically, a plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.

*Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008) (citations omitted) (internal quotations omitted).

### III. ANALYSIS OF REEVES' MOTION FOR PARTIAL SUMMARY JUDGMENT

#### A. Reasonable Jurors Could Conclude that Case Did Not Fail to Reasonably Accommodate Reeves

To succeed on her failure to accommodate claim at the summary judgment stage, Reeves would need to show that no reasonable juror could fail to find in her favor on all five elements of such a claim:

> (1) she is disabled within the meaning of the [ADA]; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) [Case] knew or had reason to know about her disability; (4) she requested an accommodation; and (5) [Case] failed to provide the necessary accommodation.

*Myers*, 182 Fed. Appx. at 515 (citation omitted).  While the Court will not, as previously explained, discuss Reeves' qualifications at this time, it is clear that Reeves cannot meet her burden on two of the remaining five elements.[27]

#### 1. On the Record Before the Court, All Reasonable Jurors Would Conclude that Reeves Has a Qualifying Disability

Case first contends that Reeves has failed to conclusively establish that she has a qualifying disability.  (Doc. 54 at 16.)  While Case concedes that Reeves suffers from seizure disorder, it argues that Reeves must show that the disability for which she was on leave was a qualifying disability, not merely that some qualifying disability existed.  (*Id.* at 17.)  To this extent, Case is assuredly correct.  Reeves' seizure disorder is irrelevant to an analysis of this claim – Reeves does not even assert that her

---

[27] The Court also will not discuss the fifth element, as there is no serious dispute about it – Case did not continue to employ Reeves.

seizure disorder requires any form of accommodation.  Indeed, when Reeves reported this disability to Case, she specifically stated that she did <u>not</u> require any accommodation for it.  (*See* Doc. 53 at 29-30.)

Case next argues that Reeves has failed to establish that her MDD constitutes a disability as a matter of law, because Reeves has not proven that it substantially restricts her from major life activities. (Doc. 54 at 26.)  While Case is correct that Reeves must show that her MDD substantially restricts her from major life activities, *see, e.g.*, *Sutton v. United Air Lines*, 527 U.S. 471, 478 (1999), *superceded on other grounds as explained in Verhoff v. Time Warner Cable, Inc.*, 299 Fed. Appx. 488, 492 (6th Cir. 2008), she has met her burden and done so.  First, Reeves presents uncontroverted testimony that her depression severely restricts her sleeping to a maximum of 1-3 hours each night (*see* Doc. 26-2 at ¶ 19), which is a major life activity *cf. Verhoff*, 299 Fed. Appx. at 492 (collecting cases and noting that five hours of sleep is not an unreasonably low amount).  Second, she provides uncontroverted testimony that her MDD prevents her from interacting with others or even leaving her bed.  (Doc. 26-2 at ¶ 19),  Third, she provides an uncontroverted affidavit establishing that she has MDD.  (*See* Doc. 26-3.)  Case presents no evidence in opposition to this.[28]  On the current record, accordingly, all reasonable jurors would

---

[28] Case does make two arguments, neither of which contradicts Reeves' evidence.  First, Case points to Reeves' employee grievance form, on which she complained about her supervisor.  (Doc. 54 at 28.)  Case asserts that this shows that all of Reeves' job-related stress was related to her particular supervisor.  This is incorrect – pointing to an employee grievance form would not allow a reasonable juror to reach such a conclusion.

Case also argues that two reports authored by Reeves' treating psychiatrist (*see* Docs. 26-3 and 26-10), Philip L. Lartey, MD, establish that Reeves' MDD was only related to her job (*see* Doc. 54 at 27).  This, too, is unavailing.  First, as already explained, the Court will not consider this first report because the parties have not provided a fully legible copy of it (although the Court can read the particular sentence to which Case refers).  Second, it is remarkably difficult to determine that these were the documents (Docs. 26-3 and 26-10) to which Case was referring and the Court would have been well-within its discretion to decline to consider them for that reason as well.  Third, the two quoted sentences "[c]ontinued exposure to job stress would delay recovery" and "the stressors [were] work related" would not, without context, enable a reasonable juror to conclude that Reeves' MDD was *only* related to her job.  Fourth, that is not what the second sentence says.  The second sentence says that "<u>most of</u> the stressors [were] work related."  (Doc. 26-10 at 11 (emphasis added).)

conclude that Reeves' MDD substantially restricts major life activities, and is thus a qualifying disability.

### 2. Reasonable Jurors Could Conclude that Case Did Not Know that Reeves Was on Leave for a Disability on November 12, 2003

As Case correctly argues, the question under this prong is not whether Case was generally aware that Reeves had some disability, but whether Case was aware that Reeves was on leave for that disability. Reeves argues that Case has already admitted that it was aware that she was on leave for a qualifying disability, because Case granted Reeves "personal medical leave," and the definition of "personal medical" is "sick time and all medical disabilities." (*See* Doc. 58 at 10; *see also* Doc. 26-10 at 6-7 (defining "disability" as it is used in the ADA).) The problem here is that Reeves initially informed Case that she was taking a leave of absence for "wrist surgery," not depression. (Doc. 53 at 5.) Reeves has not submitted evidence such that all reasonable jurors would conclude that Reeves had informed Case that she was away from work because of a qualifying disability prior to November 12, 2003 when Case told her that it would "be hiring someone [else] to fill [her] position" (Doc. 23 at 16).[29]

### 3. Reasonable Jurors Could Conclude that Reeves Never Requested an Accommodation

Although Reeves did submit a document from her doctor requesting an extension of her leave, when an employer has an established procedure for requesting an accommodation, the employee must ordinarily avail herself of that procedure. *See Erbel v. Johanns*, No. 3:04-CV-555, 2007 U.S. Dist.

---

[29] This is something of a close call. Reeves did enter into evidence a pair of two-sentence letters from her psychiatrist requesting that Case extend her leave, one of which was sent on September 22, 2003 (*See* Doc. 26-9 at 25.) Although these letters did not contain any particular information regarding the reason for Reeves' leave of absence, they were sent by a psychiatrist. Case, moreover, has testified that it was aware, at some point prior to February 4, 2004, that Reeves was on leave of absence related to depression. (Doc. 26-6 at 14-15.) The Court, as well, makes note of the presence of a document apparently informing Case that Reeves was disabled under the <u>FMLA</u> (*see* Doc. 26-9 at 26 (not referring to the ADA)), sent at some indeterminate time. Nevertheless, viewing the facts in the light most favorable to Case, a reasonable juror could conclude that, on November 12, 2003, the relevant date viewing the facts in the light most favorable to Case, Case still reasonably believed that Reeves was on leave related to her wrist surgery.

23

LEXIS 33900, at *22 (E.D. Tenn. May 8, 2007) ("[W]hen an employer establishes a fixed set of procedures to request accommodations, the employee's failure to file a proper request dooms her claim for failure to accommodate." (citing *Edwards v. United States EPA*, 456 F. Supp. 2d 72, 103 (D.D.C. 2006)); *see also Bresloff-Hernandez v. Horn*, No. 05-Civ.-0384, 2007 U.S. Dist. LEXIS 71257, at *30-31 (S.D.N.Y. Sept. 21, 2007) ("Moreover, the plaintiff did not follow the DOC's formal procedure for requesting a disability accommodation. . . . The plaintiff . . . instead submitted a brief typed memorandum without any supporting papers. . . . Without more definite notice from the plaintiff, namely, some indication of a disability and how the disability relates to the request for an accommodation, the defendant was unable to participate in the interactive process that the ADA envisions.  Therefore, the plaintiff never notified the DOC properly of the plaintiff's request for a reasonable accommodation for an alleged disability."); *c.f. Denczak v. Ford Motor Co.*, 407 F. Supp. 2d 880, 891 (N.D. Ohio 2005) ("The burden remains on the employee to request an accommodation." (citation omitted)).  Here, Case did have an established procedure (*see* Doc. 53 at 29-30), and there is no evidence that Reeves complied with it, despite having completed the very form necessary to comply with that procedure in the past (*id.*).  This would permit a reasonable juror to conclude that Reeves did not inform Case in the proper manner that she was requesting an accommodation, notwithstanding Reeves' undisputed request that she be permitted to extend her leave and, presumably, be permitted to return to work thereafter (*see* Doc. 26-9 at 24).[30]

---

[30] Notwithstanding the sensible general principle that an employee must usually follow formal procedures to request an accommodation when an employer has such procedures in place, this Court will not go as far as the Court in *Erbel* and conclude that an employee must <u>always</u> follow such a procedure. The relevant inquiry, rather, is always whether Case "knew or should have known that [Reeves was seeking an accommodation] in order to make her job conform with her medical restrictions."  *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004); *see also Russell v. Nat'l Amusements, Inc.*, No. 07-CV-3216, 2009 U.S. Dist. LEXIS 11598, at *36 (N.D. Ohio Feb. 4, 2009) (quoting same); *accord Lowery v. Hazelwood Sch. Dist.*, 244 F.3d 654, 660 (8th Cir. 2001) ("A request for accommodation, while it need not contain any magic words, must be sufficient to convey to the employer that the employee is requesting that his disability be accommodated."); *Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313* (3d Cir. 1999) ("What matters under the ADA are not formalisms about the manner of the request, but

### B. Reasonable Jurors Could Conclude that Reeves Has Not Made Out Either of Her Claims Under the FMLA

Reeves' claims under the FMLA are, under the applicable standard, very straightforward.  As an initial matter, Reeves does not purport to present evidence in support of her retaliation claim.[31]  Reeves' interference claim, as well, is not well-taken on summary judgment.  Most critically, while a reasonable jury may sometimes find interference notwithstanding a plaintiff's use of more leave than she is entitled under FMLA, *see Hunt v. Rapides Healthcare Sys. LLC*, 277 F.3d 757, 769 (5th Cir. 2001), "exceeding the twelve-week FMLA entitlement will generally defeat interference claims" *Thurston v. Cherry Hill Triplex*, No. 06-3862, 2008 U.S. Dist. LEXIS 60936, at *27-28 (D.N.J. Aug. 5, 2008).  Reeves has not provided evidence such that all reasonable jurors would depart from this standard rule.

Reeves first argues that she was given a negative performance review in retaliation for her use of FMLA-protected leave.  A negative performance review standing alone, however, is not interference

---

whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.").  Reeves noncompliance with Case's formal procedures make this a harder argument for Reeves, but not, as implied by *Erbel*, an impossible one.

[31] Case states that Reeves does not move for summary judgment on her retaliation claim.  (Doc 54 at 41.)  This is not exactly correct (*see* Doc. 26 at 1 ("Reeves asks this Court to enter summary judgment in her favor with respect to her claim**s** arising under the Family and Medical Leave Act." (emphasis added); *id*. at 23 ("Reeves is therefore entitled to summary judgment on her FMLA interference and retaliation claim [sic].")), although Case's confusion appears legitimate: not only did Reeves fail to obviously allege her retaliation claim, Reeves did not address Case's characterization of her retaliation claim on reply (*see generally* Doc. 58).

Reeves does, the Court notes, briefly argue that she was not rehired because she availed herself of leave under FMLA.  Notwithstanding the above, this should probably be read as an attempt to make out a retaliation claim.  Reeves, however, has provided only the thinnest evidence explaining why she was not rehired by Case.  (*see* Doc. 26-1 at 22; Doc. 58 at 29-30.)  The lynchpin of her argument is that she was not rehired in part because she had not completed certain budgeting work while on FMLA leave.  (*see id*.)  As previously discussed by the Court, the letter Reeves cites in support of this contention could reasonably be read as a complaint that Reeves did not have proper procedures in place in the event that she was unable to personally complete some of her assigned tasks, rather than a complaint about Reeves' use of FMLA leave itself.  Even if this single sentence were read as Reeves encourages, Reeves still would not have met her burden to show that all reasonable jurors would conclude that, "but for" her use of FMLA leave, she would have been rehired.

under FMLA.  *Wojan v. Alcon Labs., Inc.*, No. 07-11544, 2008 U.S. Dist. LEXIS 69576, at *17-18 (E.D. Mich. Sept. 15, 2008) ("[A] negative review is [only] actionable . . . where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." (quoting *LaCroix v Sears*, 240 F.3d 688, 692 (8th Cir. 2000)); *see also Lahar v. Oakland County*, 304 Fed. Appx. 354, 359 (6th Cir. 2008) (per curiam); *Bacon*, 192 Fed. Appx. at 343 (6th Cir. 2006).  Reeves does point to being placed in something called "progressive counseling," as a result of this review (*see* Doc. 21 at 18; Doc. 58 at 29), but she has not even attempted to argue how progressive counseling "detrimentally alter[ed] the terms or conditions of her employment," nor provided evidence from which the Court could, sua sponte, conclude that it did.  *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) ("[T]o characterize a negative performance evaluation as an adverse employment action "the plaintiff must point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation.'" (quoting *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 789 (6th Cir. 2000))); *Bacon*, 192 Fed. Appx. at 343 ("An adverse employment action 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" (quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. Ohio 1999))).

## IV. THE COURT DECLINES TO IGNORE ANY OF CASE'S DECLARATIONS, BUT FINDS THAT CASE PROVIDED DEPOSITION TESTIMONY IN BAD FAITH

After Case filed its response brief, Reeves filed a motion to strike one of the supporting declarations thereto.  (Doc. 59.)  As an initial matter, the Court notes that the Federal Rules do not authorize courts to strike portions of a summary judgment motion from the record; they only require that supporting or opposing declarations "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(e); *see also Tucker v. Potter,* No. 06-CV-2359, 2009 U.S. Dist. LEXIS 61060, at *33 (N.D. Ohio July 6, 2009).  The procedural rule that discusses a court's authority to strike items from the record is Fed. R. Civ. P.12(f), which permits striking matters only from pleadings.  While some courts have employed Fed. R. Civ. P.12(f) to strike an affidavit or a brief, or portions thereof, there is no basis in the

26

Federal Rules for doing so.  *McLaughlin v. Copeland*, 435 F. Supp. 513 (D. Md. 1977).  In fact, a decision in this district, affirmed by the Sixth Circuit Court of Appeals, refused to employ Fed. R. Civ. P. 12(f) to strike an affidavit because "the rule relates only to pleadings and is inapplicable to other filings."  *Dawson v. City of Kent*, 682 F. Supp. 920 (N.D. Ohio 1988), *aff'd*, 865 F.2d 257 (6th Cir. 1988); *see also Zerman v. City of Strongsville*, No. 1:04-CV-2493, 2006 U.S. Dist. LEXIS 70503, at *21-26 (N.D. Ohio Sept. 28, 2006), *aff'd*, 259 Fed. Appx. 723 (6th Cir. 2008).  Accordingly, a motion to strike is improper, and it must be denied.

Having said that, however, it remains true that the Court should not consider materials that are tendered in a manner not authorized by the Federal Rules of Evidence when analyzing the parties' briefing on Reeves' motion for summary judgment.  *Tucker,* 2009 U.S. Dist. LEXIS 61060, at *33.  Hence, while Reeves' motion itself is somewhat improper, the Court must still determine whether it should consider the relevant declaration.  *Id.*

Reeves asserts that this Court should not consider the October 4, 2008 declaration of Reeves' former supervisor, G. Dean Patterson ("Patterson"), because it "contains numerous remarks that conflict with prior sworn testimony, and is offered in bad faith to mislead the Court."  (Doc. 59 at 1.)  While Reeves only points the Court to a single alleged discrepancy, it is a serious one.  Reeves asserts that, while Patterson testified during his deposition that he did not play any part in the decision to terminate Reeves, Patterson's declaration is directly to the contrary.  (*Id.* at 1-3.)  Case, in turn, argues that the deposition and declaration refer to two separate events – that Patterson testified in deposition that he played no part in the decision not to extend Reeves' 26 weeks of non job-protected leave, but explains that he did personally decide to replace Reeves as Director of Access/Trio after the expiration of her 12 weeks of job-protected leave.  (Doc. 61 at 2.)[32]

---

[32] Case also argues that Reeves' motion is untimely, because, Case asserts, it should have been filed when Case attached the Patterson declaration to its motion for summary judgment on October 23, 2008.  (*See* Doc. 61 at 6-7.)  This argument is not well-taken.  As an initial matter, a Court should not

On one hand, as even Reeves implicitly concedes on reply, it is plausible that Case's description of Patterson's role is accurate.  (*See* Doc. 63 at 3.)  On the other hand, this description was offered only in response to Reeves' Motion to Strike.  Patterson's declaration and deposition, however, directly conflict with each other, and it is difficult to escape the conclusion that they have been offered to mislead.  During his deposition, Patterson offered the following testimony:

> Question: Did anybody at any point in time ever ask your for your input or advice with respect to Carrie Reeves' separation from employment:
> Answer: I'm not sure.
>
> . . . .
>
> Question: [I]t sounds to me that someone explained to you that Carrie was going to be or informed you that she was going to be separated from employment, is that your testimony?
> Answer: Yes.
>
> Question: Who was it that informed you that Carrie Reeves was to be separated from her employment as the Director of Access/Trio programs?
> Answer: Human resources.
>
> . . . .
>
> Question: Did you understand that Carrie Reeves was removed from her position as Director of Access/Trio programs?
> Mr. Wallace: Same objection.
> Answer: No.
>
> Question: Your testimony is, she voluntarily quit her position; is that correct?
> Answer: Yes.
>
> Question: Your testimony is that she was not terminated from her position as director of Access/Trio, correct?
> Answer: Yes.
>
> . . . .
>
> Question: Your testimony is that she was not removed from her position, correct?

---

consider evidence that is offered in bad-faith, regardless of when it comes to the Court's attention that the evidence is improper.  Of perhaps greater relevance, however, this motion is not untimely; briefing on Case's motion for summary judgment was suspended as a result of Case's discovery violations and, consequently, Reeves never needed to file any type of response to Case's October 23, 2008 motion.

Answer: Yes.

Question: And I take from that that you are uncomfortable describing her separation from employment as anything other than voluntary; is that fair?
Mr. Wallace: Object to the form.
Answer: Yes.

. . . .

Question: [D]o you understand that one of the contentions in this case is that [Reeves] did not voluntarily resign from employment; do you understand that?
Answer: Yes.

Question: So what word would you be comfortable with throughout today's deposition for me to use so that you understand that I'm referring to the fact that she no longer works at Case?
Answer: I would say released from her position.

Question: Is it true that the sole reason Carrie Reeves was <u>released from her position as Director of Access/Trio programs</u> was because her personal medical leaves exceeded 26 weeks in a 12-month period, correct?
Mr. Wallace: Foundation, objection.
Answer: Yes.

Question: And according to you, you learned that through [Human Resources]; is that correct?
Answer: Yes.

(Doc. 61-1 at 5-7) (emphasis added).  Patterson's declaration, however, states: "<u>I elected to remove Reeves from her position as Director of Access/Trio</u> and open the position for application."  (Doc. 24 at ¶ 87) (emphasis added).  This is a circle that can not be squared with his deposition answers.

The Court has strained to read Patterson's deposition in a way that is consistent with Case's current argument and failed.  Even taking Case's (plausible) argument about the distinction between removal as the head of Access/Trio and removal from Case (*see* Doc. 61 at 2) is a fair one, there is no escaping the conclusion that Patterson's deposition testimony was not only misleading, it was false.  Depositions, of course, can be high-pressure situations and it is not, in isolation, impossible that Patterson was simply confused at the time.  If so, however, it is curious that Patterson has not ever

drawn this distinction expressly, despite ample opportunity to do so.[33]  In light of the contentious and vigorous nature of this litigation, moreover, the Court is confident that Case would have reviewed this deposition transcript on many occasions after the deposition itself.  Honest confusion could have been easily clarified, yet this testimony was not.

The question, however, is how the Court should address the above.  In light of Patterson's conflicting testimony, this Court considered not only ignoring any of Patterson's testimony in this opinion, but even barring Patterson from testifying on Case's behalf.[34]  The Court holds, however, that Reeves may reopen Patterson's deposition at Case's expense and question him on <u>any</u> topic.[35]

## V. CASE'S MOTION FOR SUMMARY JUDGMENT IS TERMED AND CASE MAY NOT REFILE ITS ADA OR FMLA CLAIMS

The Court, finally, turns to the pending discovery dispute and Case's motion for summary judgment, which has been stayed as a result of it.  The Court has held four conferences with the parties regarding this dispute, the first three conducted by its staff and the final conducted personally, and need not delve too deeply into the details of this dispute here.[36]  The Court will briefly outline Case's violations, however, to provide context for its current ruling:

---

[33] Case's argument that Reeves' counsel was unclear during the deposition is unpersuasive.  The Court has reviewed the relevant portion of the deposition in full and concluded that Patterson must have understood the above-quoted questions.  Case's argument, indeed, that Reeves should have distinguished between her removal as Director of Access/Trio and her removal from Case (Doc. 61 at 9) is nonsensical: given that Patterson, the subject of the deposition, made no such distinction, there was no reason for Reeves' to make one.

[34] While the Court did ultimately rely on portions of Patterson's testimony, particularly for background, the Court would have reached its conclusion that Reeves had not met her burden under the applicable summary judgment standards even without that testimony.

[35] The deposition should not last more than 5 hours.

[36] The Court has, of course, fully considered the very detailed letters written by both parties. (*See* Docs. 46-48; *see also* Doc. 49.)

- Case initially failed to produce numerous documents until after the close of fact discovery, apparently on the grounds that they were stored electronically.  (*See* Doc. 47 at 1; *id*. at 3.)[37]  At least one of these documents was both material and damaging to Case.  (*See* Doc. 58 at 14 n.8.)[38]

- Case produced certain documents for the first time only after conferences with the Court's staff, notwithstanding that Case never disputed Reeves' right to those documents.

- One document was produced, for the first time, in Case's responsive brief to Reeves' motion for partial summary judgment.  (*See id*. at 21 n.10.)

- It is entirely unclear that Case has performed a full and thorough search for electronically-stored information ("ESI").  Of particular concern, Patterson testified that a certain critical file was kept on his computer, yet Case represented during discovery conferences that Patterson's computer had been changed twice during the pendency of this litigation.  (*See* Doc. 48 at 3.)  Case has never provided a full and forthright answer to whether the information that had been on his computer was or was not destroyed, and has represented at various times that some or all of the information that had been on Patterson's computer may be on various Case file servers, though no production from those servers appears to have occurred.

- Reeves alleges that it seems Case has destroyed evidence.

With respect to this discovery dispute, the Court finds:

- Reeves has presented a compelling argument for being allowed to reopen depositions of witnesses, so that she may examine them with documents that were produced after the close of discovery.  She is also, moreover, correct that Case should bear the additional expense of these depositions.

- In light of the larger concerns about discovery of ESI in this case, Case is ordered to perform a comprehensive examination of all electronic storage (e.g., personal computers, servers, flash drives, backup tape, CD-ROMs, etc.) where information

---

[37] All modern discovery includes e-discovery and the Federal Rules do not distinguish a parties' right to information solely based on the form in which that information is stored.  *See, e.g.*, *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003) ("Many courts have automatically assumed that an undue burden or expense may arise simply because electronic evidence is involved.  This makes no sense." (footnote omitted).)  Case confuses the distinction between substantive documents that happen to be stored electronically, which must always be produced assuming such production does not involve undue burden or expense, *see id*., with the metadata for those documents, which ordinarily need not be produced absent the showing of some particularized need for that data (*see, e.g.*, Doc. 47 at 4-7).

[38] The Court explicitly rejects Case's contention to the contrary.  (*See* Doc. 47 at 2.)

reasonably expected to be related to this litigation might be stored.[39]  Case may assert, within 20 days, that a particular source of information is unduly burdensome to search.  Case must, if it wishes to make such an assertion, provide a <u>detailed</u> explanation of why a particular source of information is unduly burdensome relative to the information that it is expected to contain.

- Case is not entitled to refile its motion for summary judgment with respect to Reeves' ADA and FMLA claims as a sanction for failing to even search for certain evidence relevant to these claims until after both the close of fact discovery and the dispositive motion deadline.[40]

- The Court, at present, reaches no conclusion relating to the potential destruction of evidence, but will allow Reeves to raise the issue in the future, if appropriate.[41]

- Case may, if it wishes, file a new motion for summary judgment within 21 days with respect to Reeves' other claims.

The Court, accordingly, Orders Case to produce, within 60 days, a certification to Reeves that <u>all</u> reasonably likely sources of ESI have been examined unless Case has received specific permission from the Court not to search a given source, and must explain, in that certification, how Case determined

---

[39] Case should already have done this under the Federal Rules.  Apparently, it has not.

[40] This being said, the Court urges Reeves, in the strongest possible terms, to ensure that she has a good-faith belief that her remaining claims are appropriate for submission to a jury.  Reeves should carefully examine, in particular, the strength of her FMLA claims.  An order from the Court withdrawing claims from the jury because they are inadequate as a matter of law rarely inures to a plaintiff's benefit.  Reeves and her counsel, like Case and its counsel, are, moreover, bound by all relevant ethical obligations, including the obligation to refrain from unduly or vexatiously multiplying this litigation.  The Court notes, conversely, for the reasons explained in this order, that it appears unlikely from the record that Case could prevail on a motion for summary judgment with respect to Reeves' ADA claims, even if permitted to file one.

[41] The Court does note that Case's argument regarding the number of pages it has produced is singularly unpersuasive.  The question is whether Case inappropriately destroyed, or declined to produce, evidence, not whether Case produced a lot of paper.  *C.f. Leggett & Platt, Inc. v. Vutek, Inc.*, No. 4:05-CV-788, 2006 U.S. Dist. LEXIS 53008, at *13 (E.D. Mo. July 31, 2006) ("Although the number of pages may have been small relative to the entire document production, the carelessness with which [Defendant] handled them overrides that factor."); *McBean v. City of New York*, 233 F.R.D. 377, 386 (S.D.N.Y. 2006) ("[I]n accord with this Court's analysis of the discovery necessary for procedural fairness, the inquiry into the amount of discovery necessary for substantive fairness is not a matter of attaining some rigid number of pages or depositions."); *Todd v. Blue Ridge Legal Servs.*, No. 5:01-CV-21, U.S. Dist. LEXIS 12628, at *5 (W.D. Va. Aug. 17, 2001) ("[T]he determination of whether plaintiff had 'ample opportunity' for discovery is not simply about counting the number of pages in the record before it.").

where ESI would likely be stored and what type of examination was performed. Case must also, produce, within 60 days, any remaining non-privileged ESI to Reeves that is responsive to Reeves' discovery requests. Reeves may then seek leave to reopen the deposition of witness to the extent she can establish the need to reexamine any witnesses about information that had not been produced by the time of that witnesses' first deposition. Such depositions must be completed within 120 days.

## VI. CONCLUSION

For the aforementioned reasons, Reeves' Motion for Partial Summary Judgment (Doc. 26) is **DENIED**, Reeves' motion for the Court to ignore a supporting declaration (Doc. 59) is **DENIED**, and Case's Motion for Summary Judgment (Doc. 25) is **TERMED** and may not be refiled with respect to Reeves' ADA or FMLA claims. Case may submit a new summary judgment motion, fully complying with this order, within **TWENTY-ONE DAYS**. Trial is set for May 18, 2010. A trial order will follow.


**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**


**Dated: September 30, 2009**